**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| **CENTRAL CLAIMS SERVICE, INC.** | ) | **CIVIL ACTION NO. 07-6808** |
| | ) | |
| **v.** | ) | **SECTION L, MAG.: "5"** |
| | ) | |
| **STATE FARM FIRE & CASUALTY** | ) | **JUDGE ELDON E. FALLON** |
| **COMPANY** | ) | **MAG. ALMA L. CHASEZ** |

**STATE FARM FIRE AND CASUALTY COMPANY'S MEMORANDUM OF LAW**
**IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT**
**AS TO CLAIM FOR LOSS OF BUSINESS INCOME**

**NOW INTO COURT**, through undersigned counsel, comes State Farm Fire and Casualty Company ("State Farm") and respectfully submits this memorandum of law in support of its motion for partial summary judgment as to the claim for loss of business income.

Central Claims Service, Inc. ("CCS") is a corporation that holds itself out as offering premier claims adjustment services for insurance companies, including emergency claims services for catastrophes such as Hurricane Katrina. In the aftermath of Hurricane Katrina, CCS adjusted a larger than normal volume of claims and earned record profits. According to its financial records, CCS's net income increased from $67,123.73 before Hurricane Katrina to $603,536.50 for the following year. Even though its net income *increased* by 899 percent and its 2006 reported taxable income was far higher than the previous five years of taxable income *combined*, CCS contends that it sustained a *loss* of income.

1

At the time of Hurricane Katrina, CCS held a business policy with State Farm. The policy afforded several distinct kinds of coverage, including coverage for CCS's offices, business personal property, and loss of income.[1] Although CCS did sustain covered losses to its buildings and personal property, those claims are not at issue in this motion. Rather, this motion is directed only to CCS's claim for loss of income coverage.

CCS argues that even though it indisputably earned record profits, it might have earned even more profits if it had operated from its primary offices while it adjusted Hurricane Katrina claims. In other words, CCS seeks coverage for alleged lost opportunities created by Hurricane Katrina. CCS's loss theory, however, is contrary to the language of its policy, which requires that CCS sustain an ***actual loss*** of business income. In this case, there is no actual loss – there is a substantial gain.

Courts that have adjudicated similar loss of income claims after Hurricane Katrina have concluded that coverage does not apply because there is no actual loss. *See, e.g.*, *B.F. Carvin Constr. Co., Inc. v. CNA Ins. Co.*, 2008 WL 5784516, at *3 (E.D. La. July 14, 2008) (Berrigan, J.) (granting judgment for insurer, holding insured "is not entitled to recover losses resulting from business interruption because [its] 'Business Income' increased as defined by the insurance policy after Hurricane Katrina"); *Rimkus Consulting Group, Inc. v. Hartford Cas. Ins. Co*., 552 F. Supp. 2d 637, 645 (S.D. Tex. 2007) (granting insurer summary judgment, holding coverage denial was proper "for business interruption losses because [the insured] suffered no actual loss that triggered coverage"); *see also Fireman's Fund Ins. Co. v. Holland Am. Line-Westours, Inc.*, 25 F. App'x 602, 603 (9th Cir. 2002) (reversing judgment for insured because the insured "should not be awarded damages for losses it never sustained," which would be "a substantial

---

[1]    The loss of income section of CCS's policy also provides coverage for extra expenses, but that coverage is not at issue in this motion.

windfall").

Moreover, courts have specifically rejected claims that closely parallel CCS's claim for lost opportunities created by Hurricane Katrina. *See, e.g.*, *Catlin Syndicate Ltd. v. Imperial Palace of Miss., Inc.*, 2008 WL 5235888 (S.D. Miss. Dec. 15, 2008) (granting insurer's motion for summary judgment and barring loss of income claim for projected increased profits from special market conditions following Hurricane Katrina); *see also Prudential LMI Commercial Ins. Co. v. Colleton Enters., Inc*., 1992 WL 252507 (4th Cir. 1992) (reversing judgment for insured in Hurricane Hugo case and rejecting loss of income claim for projected increased demand in post-storm market). Although CCS posits that it lost the opportunity to work more insurance claims than it actually did, these purported opportunities never would have arisen but for Hurricane Katrina. CCS seeks to recover business income for alleged opportunities created by the loss that would not have existed but for the loss. As shown below, this proposition is contrary to the policy and case law.

In sum, the material facts underlying CCS's loss of income claim are undisputed:  CCS was covered for loss of income and increased its net income by 899 percent following Hurricane Katrina. The core dispute at issue in this motion is the meaning of CCS's policy in light of CCS's claim for loss of business income. As discussed below, CCS's policy, by its unambiguous terms, provides no coverage where there is no ***actual loss*** of business income and provides no coverage for alleged lost opportunities created by Hurricane Katrina. CCS's loss theory is contrary to the plain language of the business policy and the case law interpreting that language.

This motion, therefore, presents the Court with a pure question of law that is ripe for summary judgment. *See St. Joseph's Condo. Ass'n, Inc. v. Pac. Ins. Co.*, 2008 WL 4717463, at

*3 (E.D. La. Oct. 27, 2008) (Fallon, J.) ("The interpretation of an insurance contract is typically a question of law that can be properly resolved in a motion for summary judgment.").  This Court should grant State Farm's motion for partial summary judgment in its entirety and hold that loss of income coverage does not apply because (i) there is no actual loss and (ii) the policy does not cover alleged lost opportunities created by Hurricane Katrina.

### FACTUAL BACKGROUND

CCS is a corporation that investigates and adjusts insurance claims for large insurers throughout Louisiana.  [Deposition of Dale Jones, attached hereto as **Exhibit A**, at 102-03.]  At the time of Hurricane Katrina, CCS had two adjacent offices, located at 3320 Causeway Boulevard and 3212 16th Avenue in Metairie, Louisiana.  [Pet. (Doc. 1-2) ¶ 2.][2]  CCS insured its offices, business personal property, and business income under a State Farm Business Policy.  [*Id.* ¶¶ 1-2.]  CCS's offices sustained damage during Hurricane Katrina, and in September 2005, CCS filed an insurance claim for, among other things, lost income.  [Am. Compl. (Doc. 31) § II, ¶ 9.]  Despite numerous and repeated requests by State Farm, CCS never provided State Farm with its complete financial records showing its actual earnings and expenses for the period of restoration prior to filing this action.  CCS has finally produced its financial records that, coupled with the recent admissions of its corporate representatives in deposition, confirm what State Farm suspected:  CCS did not sustain a loss of income.

### I.    CENTRAL CLAIMS SERVICES' CATASTROPHE OPERATIONS

Following Hurricane Katrina, CCS established multiple alternative offices from which to base its catastrophe services operations.  [*See, e.g.*, Ex. A at 490:15-18, 493:3-20, 567:9-22.] CCS operated from these alternative locations until it returned to its offices in the midst of

---

[2]    In its Amended Complaint, CCS incorporated its allegations from its original Petition.  [Am. Compl. (Doc. 31) ¶ 1.]

ongoing repair.  [Ex. A at 33, 490, 793.]

In the twelve months after Hurricane Katrina, CCS's net income rose from $67,123.73 to $603,536.50, or 899 percent.  [*Compare* Pre-Katrina Profit & Loss Statement (August 29, 2004 through August 28, 2005), attached hereto as **Exhibit B**, *with* Post-Katrina Profit & Loss Statement (August 29, 2005 through August 28, 2006), attached hereto as **Exhibit C**, each from Quickbooks files produced by CCS in discovery.]  CCS's pre-Katrina Profit and Loss Statement for August 29, 2004 through August 28, 2005 shows that CCS earned a net income of $67,123.73 (it earned $3,546,735.92 and spent $3,479,612.19).  [*Id.*]  CCS's post-Katrina Profit and Loss Statement for August 29, 2005 through August 28, 2006 shows that CCS earned a net income of $603,536.50 (it earned $11,850,024.85 and spent $11,246,488.35).  [*Id.*; *see also* Ex. A at 715-16.]

CCS proffered Mr. Jones as a corporate representative and person most knowledgeable on all aspects of CCS's business and claims.  [Ex. A at 8-9; State Farm's Notice of 30(b)(6) Deposition, attached as Ex. 1 to Ex. A]  He confirmed that CCS made "more profit" in the twelve months after Hurricane Katrina than in the preceding twelve months.  [Ex. A at 1103-06.]  Thus, it is not disputed that CCS earned more money in the twelve months after Hurricane Katrina than in the prior twelve months.

When questioned about CCS's claim for lost income despite such a favorable financial posture, Mr. Jones testified that CCS seeks "additional profit" that it allegedly would have earned if its offices were opened earlier.  [*Id.* at 1106-08, 1113-15.]  Mr. Jones theorizes that CCS would have adjusted more property insurance claims if it had operated from its offices instead of its alternative facilities.  [*Id.*]  CCS alleges that it is entitled to general and specific damages for "all loss of business income it might suffer as a result of a suspension of its

operations or inability to perform its business operations, including but not limited to loss adjustment, as a result of a covered peril or loss event such as Hurricane Katrina." [Am. Compl. (Doc. 31) § II, ¶ 9.]

## II.    PERTINENT BUSINESS POLICY LANGUAGE

CCS's business policy provides the following language for business income coverage:

If Loss of Income coverage is shown in the Declarations, we will pay:

1. for *the actual loss of "business income" you sustain* due to the necessary suspension of your "operations" during the "period of restoration." The suspension must be caused by accidental direct physical loss to property at the described premises . . . caused by an insured loss;

[Policy, attached hereto as **Exhibit D**, at 4 (emphasis added).] The term "business income" is specifically defined in the policy to mean "the *net income* (net profit or loss before income taxes) that would have been earned or incurred *and continuing normal operating expenses*, including payroll, incurred during the 'period of restoration.'" [*Id*. (emphasis added).]

To compute "the amount of 'business income' loss," the policy states that several factors are considered:

1.    The amount of "business income" loss will be determined based on:

   a.    the *net income* of the business *before the accidental direct physical loss occurred*;

   b.    the *likely net income* of the business *if no loss occurred*;

   c.    the operating expense, including payroll expenses, necessary to resume "operations" with the same quality of service that existed just before the accidental direct physical loss; and

   d.    other relevant sources of information, including:

      (1) your financial records and accounting procedures;

      (2) bills, invoices and other vouchers; and

      (3) deeds, liens or contracts.

[Ex. D at 5 (emphasis added).]

Moreover, the policy limits the time period in which CCS can claim a loss of income. The policy calls this time the "period of restoration," which is defined as follows:

> [T]he period of time that:
>
>    a.    begins with the date of accidental direct physical loss caused by an insured loss at the described premises; and
>
>    b.    ends on the date when the property at the described premises should be repaired, rebuilt or replaced with reasonable speed and similar quality.

[*Id.* at 4-5.]  Mr. Jones testified that it took more than a year to complete repairs to CCS's offices.  [Ex. A at 713-14.]  But the policy limits the maximum time period for a loss of income to twelve months after the day of loss:

> We will only pay for loss of "business income" . . . that occurs within 12 consecutive months after the date of the accidental direct physical loss caused by an insured loss.

[Ex. D at 4.]

## ARGUMENT AND AUTHORITIES

### I.    SUMMARY JUDGMENT STANDARD

Summary judgment should be granted when "there is no genuine issue as to any material fact and . . . the movant is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); *see, e.g.*, *N.Y. Life Ins. Co. v. Travelers Ins. Co*, 92 F.3d 336, 338 (5th Cir. 1996); *Rogers v. Int'l Marine Terminals, Inc.*, 87 F.3d 755, 758 (5th Cir. 1996).  A "party moving for summary judgment must 'demonstrate the absence of a genuine issue of material fact,' but need not *negate* the elements of the nonmovant's case."  *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

A "material" dispute of fact is one that might affect the outcome of a lawsuit under the governing substantive law.  *See Phillips Oil Co. v. OKC Corp*., 812 F.2d 265, 272 (5th Cir.

1987).  Where "the summary judgment evidence establishes that one of the essential elements of the plaintiff's cause of action does not exist as a matter of law, . . . all other contested issues of fact are rendered immaterial."  *Topalian v. Ehrman*, 954 F.2d 1125, 1138 (5th Cir. 1987).

## II.    CCS SUSTAINED NO "ACTUAL LOSS OF BUSINESS INCOME," PRECLUDING COVERAGE FOR LOSS OF INCOME

CCS's business policy and the indemnity principle require that CCS sustain an actual loss of business income to trigger loss of income coverage.  In this case, it is undisputed that CCS earned record profits from Hurricane Katrina because of the high volume of insurance claims that it adjusted.  When compared to its historical profits for the twelve months preceding Hurricane Katrina, CCS's post-Katrina financial posture was more robust than before the storm.  Yet CCS's policy only provides loss of income coverage "for the ***actual loss*** of 'business income' you sustain."  [Ex. D at 4 (emphasis added).]  CCS cannot demonstrate that it sustained an actual loss of business income because it is undisputed that CCS's business income ***increased*** several-fold following Hurricane Katrina.  Unable to demonstrate any actual loss, CCS's loss of income claim is untenable as a matter of law.

CCS bears the substantive burden to prove the amount of any covered loss it sustained with legal certainty.  "In claims for losses resulting from business interruption, the claimant bears the burden of proving that it is entitled to proceeds under the insurance policy and the amount of that entitlement."  *B.F. Carvin Constr. Co.*, 2008 WL 5784516, at *2; *see also Olivier v. LeJeune*, 95-0053, p.5 (La. 2/28/96); 668 So. 2d 347, 349; *Hargroder v. Protective Life Ins. Co.*, 556 So. 2d 991, 997 (La. App. 3 Cir. 1990).  CCS cannot meet this burden here because the record shows that CCS did not sustain an actual loss of business income.

While CCS's primary offices were temporarily closed, CCS continued adjusting insurance claims.  Hurricane Katrina generated a uniquely large number of insurance claims,

which in turn produced a high volume of business for CCS. It is, thus, not surprising that CCS's financial posture greatly improved, as reflected by its financial records. [*See* Exs. B and C]. The term "business income" is defined by the business policy to mean (i) "the net income" plus (ii) "continuing normal operating expenses," all "during the 'period of restoration.'" [Ex. D at 4.] From the time before Hurricane Katrina through the presumed twelve-month period of restoration, CCS's "business income" increased substantially -- CCS earned record profits during that period, 899 percent more than the previous year. Therefore, pursuant to the policy, CCS sustained no "actual loss of 'business income.'"

The healthy financial stature of CCS reflected by the above-referenced financial records was confirmed by CCS's President and CEO, Dale Jones, who testified that CCS made "more profit" in the twelve months after Hurricane Katrina than in the preceding twelve months. [Ex. A at 1103-06.] CCS's federal income tax returns also show its significant financial growth following Hurricane Katrina: CCS reported earning $227,568 in 2001, $133,188 in 2002, $438,198 in 2003, $14,840 in 2004, losing $80,042 in 2005, and earning $2,858,094 in 2006. [*See* **Exhibit E** attached hereto, which was originally marked as Exs. 33-36, 45, 70 to the deposition of Jones][3] Incredibly, the 2006 reported taxable income was far higher than the previous five years of taxable income combined.

Courts have repeatedly barred loss of income claims that are closely analogous to CCS's claim. For instance, Judge Berrigan rejected a loss of income claim in a Hurricane Katrina case where the plaintiff's business income increased after Hurricane Katrina. *B.F. Carvin Constr.*

---

[3]    The time periods for CCS's federal income tax returns do not precisely overlap with the period of restoration, which is the controlling period under the policy. CCS's tax returns are based upon a calendar year. But the period of restoration is alleged by CCS to be one year starting from the day of Hurricane Katrina (August 29, 2005 through August 28, 2006). [*See* Ex. A at 713-14.]

*Co.*, 2008 WL 5784516, at *2-3.   In *B.F. Carvin Construction*, the plaintiff was in the construction business and, after Hurricane Katrina, had to shift its business from public works projects to smaller residential projects.  *Id.* at *1.  The plaintiff's business policy – like the business policy in this case – defined "business income" to mean net income plus continuing normal operating expenses.  *Id.* at *2.  Judge Berrigan held that this formulation "unambiguously defines the method by which 'Business Income' is to be calculated for the purpose of determining losses resulting from business interruption."  *Id.*  Using this formulation, the court found that the plaintiff's "business income" after Hurricane Katrina was substantially greater than before the storm – "more than double," in fact.  *Id.* at *3.  Thus, Judge Berrigan entered judgment for the insurer after a bench trial:

> [T]his type of policy is designed to "prevent the insured from being placed in a **better** position than if no loss or interruption of business had occurred." Therefore, [the plaintiff's] claim for business interruption losses is barred because it already enjoys a better position based on the formula used to calculate this type of loss under the [defendant's] insurance policy.

*Id.* (emphasis in original; quoting *U. Land Investors, Inc. v. N. Ins. Co. of Am.*, 476 So. 2d 432, 436 (La. App. 2 Cir. 1985)).

In addition to *B.F. Carvin Construction*, other courts have reached the same conclusion in Hurricane Katrina litigation.  In *Rimkus Consulting Group*, the court granted summary judgment for the insurer on a claim for lost business income.  552 F. Supp. 2d at 637.  Just like CCS in this case, Rimkus was in the business of catastrophe claims adjustment and adjusted a significant number of Katrina-related claims.  *Id.* at 639.  Rimkus also had a business policy that defined a loss of business income in the same way that CCS's policy defines that term.  *Id.* at 640 ("[t]he policy defines 'Business Income' as 'the Net Income' . . . and [c]ontinuing normal operating expenses incurred;" alteration in original).  Although Rimkus's offices were damaged during Hurricane Katrina, it used temporary office space, and, "as a result of the devastation unleashed

by Katrina, Rimkus saw its revenues increase substantially in the months after the storm hit" – by "nearly four times."  *Id.* at 640 & n.1.  Therefore, "[b]ecause Rimkus suffered no business income loss, coverage under the policy was never triggered," and the insurer "properly denied [the plaintiff's] claim for business interruption losses."  *Id.* at 643, 645; *see also Catlin Syndicate Ltd.*, 2008 WL 5235888 (granting insurer summary judgment and barring business income claim for surplus profit resulting from Hurricane Katrina).

The holdings and analysis in cases like *B.F. Carvin Construction* and *Rimkus Consulting Group* follow a long line of cases with similar holdings, all rejecting loss of income claims where the insured made more money after the loss than before the loss.  *See, e.g.*, *Fireman's Fund Ins. Co.*, 25 F. App'x at 603 (reversing judgment for insured where a cruise company made more income from "make-up" reservations, lest the insured be "awarded damages for losses it never sustained" and receive "a substantial windfall"); *see also Admiral Indem. Co. v. Bouley Int'l Holdings, LLC*, 2003 WL 22682273, at *2 (S.D.N.Y. Nov. 12, 2003) (granting insurer summary judgment on loss of income claim; restaurant sustained no actual loss because it made more income from an alternative business arrangement after World Trade Center attack); *Baxter Int'l, Inc. v. Am. Guar. & Liab. Ins. Co.*, 861 N.E.2d 263, 270 (Ill. Ct. App. 2006) (affirming judgment for insurer on business loss claim following hurricane; "[A]n insured cannot recover for lost profit due to business interruption where there has been no actual loss.  In other words, business interruption is not itself a loss."); *see generally* Lee R. Russ & Thomas F. Segalla, *Couch on Insurance* § 167:11 (2008) (noting the need for an actual loss to recover for business interruption).

The holdings of the above cases apply the well-established principle of insurance law that "insurance contracts are contracts of indemnity and . . . an insured cannot recover an amount

greater than [his or her] loss." *Johnson v. State Farm Fire & Cas. Co.*, 2008 WL 2178059, at *2 (E.D. La. May 19, 2008) (Lemelle, J.); *see also Millaudon v. W. Marine & Fire Ins. Co.*, 9 La. 27, 32 (1836). The concept of indemnity is directed at restoring the insured to the position he or she occupied prior to the loss. "Hence, both the extent and the limitation of recovery is found in the concept of making good the loss which the insured has sustained." 12 Lee R. Russ & Thomas F. Segalla, *Couch on Insurance* § 175:5 (3d ed. 2006). This principle applies with equal force in the business insurance context. *See, e.g.*, *B.F. Carvin Constr. Co.*, 2008 WL 5784516, at *3. Indeed, CCS's policy only covers "the actual loss of 'business income'" that it sustains, if any. [Ex. D at 4.]

Accordingly, the record establishing that CCS's business income increased following Hurricane Katrina precludes any cognizable claim for an actual loss of income. Summary judgment for State Farm is, therefore, proper on CCS's coverage claim for lost business income and any bad faith claims arising from the loss of business income claim. *See, e.g.*, *Alami v. W. Heritage Ins. Co.*, 2008 WL 1862332, at *2 (E.D. La. Apr. 24, 2008) (Vance, J.) (holding that when a plaintiff cannot maintain a breach of contract claim, "bad faith allegations pursuant to Louisiana Revised Statutes 22:658 and/or 22:1220 must therefore fail") (citing *Clausen v. Fid. & Deposit Co. of Md.*, 95-CA-0504 (La. App. 1 Cir. 8/4/95)' 660 So. 2d 83, 85 (same)).

## III.    CCS'S CLAIM FOR LOST OPPORTUNITY IS CONTRARY TO THE POLICY, AGAINST THE WEIGHT OF AUTHORITY, AND PRECLUDED BY THE INDEMNITY PRINCIPLE

CCS's business income greatly increased following Hurricane Katrina, but CCS still contends that it sustained a loss of income. Under its theory, CCS urges that it suffered a loss because it could have earned even more profit if it had adjusted claims from its offices instead of its alternative facilities. [Ex. A at 1103-08, 1113-15.] Stated differently, CCS seeks payments for surplus business income from Hurricane Katrina itself. CCS's theory of loss, however, is

contrary to the policy language and has been repeatedly rejected by courts.

CCS's business policy does not provide coverage for opportunities created by a loss. The Loss Determination language of CCS's policy dictates the scope of coverage and tailors the scope to include CCS's actual pre-Katrina performance and its likely future performance if Hurricane Katrina had not occurred:

The amount of "business income" loss will be determined based on:

> a.  the net income of the business before the accidental direct physical loss occurred;
>
> b.  the *likely* net income of the business *if no loss occurred* . . . .

[Ex. D at 5 (emphasis added).] This "no loss" language projects the probable future income of CCS's business at the time of an actual loss (there was no actual loss here) and does not include post-storm business opportunities created by Hurricane Katrina. [*Id.*] By its plain language, CCS's policy aims to restore CCS to the same position in which it would have been if 2005 and 2006 were ordinary years following the historic course of the business. This post-loss projection applies the indemnity principle by not extending coverage to profits derived from the loss itself.

Courts have repeatedly rejected similar attempts to use business interruption coverage with "no loss" language to profit from the occurrence of a hurricane. For instance, in *Catlin Syndicate Ltd.*, a casino filed a claim for loss of income under a business policy following Hurricane Katrina. 2008 WL 5235888, at *1. The casino argued that it should recover for the extra profits it would have earned if its facility had been open immediately after Hurricane Katrina while its competitors were closed due to storm damage. *Id.* at *5. The casino's business policy contained functionally identical "no loss" language as CCS's policy. *Id.* at *4 ("[D]ue consideration shall be given to the experience of the business before the loss and the probable experience thereafter had no loss occurred."). In ruling on the insurer's motion for summary

judgment, the court was "persuaded that the weight of authority" did not support the casino's interpretation of "no loss" language. *Id.* at \*6.

The court in *Catlin* examined a Fifth Circuit case that construed "nearly identical" "no loss" language. *Id.* at \*7 (applying *Finger Furniture Co., Inc. v. Commonwealth Ins. Co.*, 404 F.3d 312 (5th Cir. 2005)). In applying "no loss" language, the Fifth Circuit held:

> Historical sales figures reflect a business's experience before the date of the damage or destruction and predict a company's probable experience had the loss not occurred. ***The strongest and most reliable evidence of what a business would have done had the catastrophe not occurred is what it is doing in the period just before the interruption***.

*Id.* (emphasis in original; quoting *Finger Furniture Co., Inc.*, 404 F.3d at 314). Thus, the court in *Catlin* was "persuaded that the same logic" from *Finger Furniture* "holds true in the present case. Pursuant to the unambiguous terms of the policy provisions at issue here, the Court is of the view that the policy contemplates a calculation based on what [the casino] probably would have done had Hurricane Katrina not occurred." *Id.* Since the casino's "competitors would have remained open" "[h]ad Hurricane Katrina not occurred," theoretical profits from an opportunity created by Hurricane Katrina were not covered by the "no loss" language. *Id.*

The United States Court of Appeals for the Fourth Circuit also rejected a business claim for lost opportunity. *Colleton*, 1992 WL 252507. In *Colleton*, the plaintiff operated a motel that was damaged during Hurricane Hugo in 1989. *Id.* at \*1. The plaintiff's business policy contained "no loss" language indistinguishable from CCS's policy language in this case. *Id.* ("In determining loss hereunder, due consideration shall be given to . . . the probable earnings thereafter, had no loss occurred."). The motel submitted a business insurance claim for the loss of "probable earnings resulting from accommodating the burgeoning demand due to the hurricane." *Id.* "The claim is that, had the hurricane not damaged the insured motel, [the plaintiff] would have been able, during the period of business interruption that followed it, to

14

profit from the influx" of people needing hotel rooms.  *Id.* at *4.  The Fourth Circuit rejected this

contention as a matter of logic and law:

> To allow the claim . . . would be to ***confer a windfall upon the insured rather than merely to put it in the earnings position it would have been had the insured peril not occurred***.  Business insurance of the type in issue here is not intended to provide such windfall coverage.
>
> The limiting principle that we apply here is but a special application of the general no-windfall principle.   It is that ***an insured*** under a business interruption provision such as that here in issue ***may not claim as a probable source of expected earnings (or operational expenses) a source that would not itself have come into being but for the interrupting peril's occurrence***.
>
> Application of this principle will not prevent – and serves to distinguish – rightful recoveries where the source of expected profit (or expense) is one ***not itself created by the interrupting peril***.  But this principle rightly prevents windfall recoveries of the type sought here.

*Id.* (citations omitted).   Thus, the Fourth Circuit reversed the district court's judgment and

entered judgment for the insurer.  *Id.*

Another federal district court reached the same conclusion as the Fourth Circuit in a

claim for lost opportunity following Hurricane Andrew.  In *American Automobile Insurance Co.*

*v. Fisherman's Paradise Boats, Inc.*, the court rejected a claim of lost opportunity following

Hurricane Andrew and granted summary judgment for the insurer.  1994 WL 1720238 (S.D. Fla.

1994).  There, the insured sold boats and marine accessories in Florida.  *Id.* at *2.  The plaintiff's

business policy contained "no loss" language similar to CCS's policy language in this case.  *Id.*

at *3 ("The likely Net Income of the business if no loss or damage occurred.").  The store closed

after Hurricane Andrew due to physical damage from wind, and the plaintiff submitted a

business insurance claim for "lost opportunity in the increased economic opportunities afforded

after Hurricane Andrew" due to a "great demand" for its products.  *Id.* at *1.  The court rejected

the plaintiff's claim as illogical, precluded by the coverage language of the policy, precluded by

the purpose behind business insurance, and contrary to holdings by other courts that have

adjudicated similar claims. *Id.* at *2, *4.

The court in *Fisherman's Paradise Boats* held that the policy was "drafted in a way that allows net income projects that are not itself created by the peril." *Id.* "'Business interruption insurance . . . is designed to protect the earnings or profits that a business would have earned, had the event insured against not intervened." *Id.* at *2 (citation omitted). "'The logical inconsistency is that 'had no hurricane occurred (the policy's built in premise for assessing profit expectancies during business interruption), [then] neither would the claimed earning source.'" *Id.* at *4 (citation omitted). The court found that "windfall profits are not within the scope of the policy" and granted summary judgment for the insurer. *Id.* at *4-5; *see also B.F. Carvin Constr. Co., Inc.*, 2008 WL 5784516, at *1-2 (rejecting coverage claim for lost opportunity of profiting from public works products "because of space and equipment limitations imposed by its operations being moved;" the plaintiff's post-Katrina business income increased even without these projects); *Rimkus Consulting Group, Inc.*, 552 F. Supp. 2d at 640 & n.1, 642, 645 (rejecting coverage claim for lost opportunity of profiting from "the business [the plaintiff] had normally conducted with its customers before Katrina hit New Orleans;" the plaintiff's post-Katrina business income actually increased without the alleged lost opportunities).

CCS's claim for lost opportunity fares no better than lost opportunity claims in the above cases. CCS complains about having lost the opportunity to work more insurance claims than it actually did because of damage to its primary offices. These purported opportunities, however, never would have arisen but for Hurricane Katrina. CCS seeks to recover business income for alleged opportunities created by the loss that would not have existed but for the loss. This proposition has been repeatedly rejected by courts.

Under *Catlin Syndicate*, *Colleton*, and *Fisherman's Paradise Boats*, among other cases,

CCS's loss theory must be dismissed as a matter of law.  As these courts have held, this Court, too, should conclude as a matter of law that CCS is not entitled to be compensated for speculative lost income generated by Hurricane Katrina.  The policy covers only the likely net income of the business if Hurricane Katrina had not occurred.  CCS's policy does not cover a windfall created by the loss itself.  Because there is no coverage as a matter of law, summary judgment for State Farm is proper, and the Court should dismiss with prejudice CCS's contract and bad faith claims for loss of business income.

CONCLUSION

Accordingly, for all the foregoing reasons, this Court should grant State Farm's motion for partial summary judgment in its entirety.

Respectfully submitted,

*s/Khristi Doss Driver*
Khristi Doss Driver
Joseph L. Cowan II
Haskell, Slaughter, Young & Rediker
2001 Park Place N, Ste 1400
Birmingham, AL 35203
(205) 251-1000
jlc@hsy.com
kdd@hsy.com

Adrianne L. Baumgartner
Kathleen E. Simon
Porteous, Hainkel & Johnson
408 N. Columbia Street
Covington, LA  70433
(985) 246-7458
abaumgartner@phjlaw.com
ksimon@phjlaw.com

## <u>CERTIFICATE OF SERVICE</u>

**I DO HEREBY CERTIFY** that on December 21, 2009, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to the following:

Kevin Cole, counsel for Plaintiff
Wesley Pitts, counsel for Plaintiff
Galloway, Johnson, Tompkins, Burr & Smith
#3 Sanctuary Blvd. Suite 301
Mandeville, LA  70471
(985) 674-6680

<u>*s/Khristi Doss Driver*</u>
OF COUNSEL